Oak Forest Mobile Home Park, Inc., Plaintiff-Counterdefendant-Appellant, *v.* The City of Oak Forest, Defendant-Counterplaintiff-Appellee.

(No. 59590;

First District (1st Division)—March 17, 1975.

Gierach, Stambulis & Schussler, Ltd., of Oak Lawn (Will Gierach and James E. Gierach, of counsel), for appellant.

Bresingham and Fera, of Oak Forest (John J. Bresingham, of counsel), for appellee.

Mr. JUSTICE GOLDBERG delivered the opinion of the court:

Oak Forest Mobile Home Park, Inc. (plaintiff) filed an action for declaratory and other relief in connection with various problems arising from the zoning ordinances of the City of Oak Forest (City). The City filed a counterclaim to enjoin various alleged ordinance violations by plaintiff in the operation of its premises. After a full trial, the circuit court entered judgment which denied the relief sought by plaintiff and permanently enjoined five specified ordinance violations by plaintiff in the maintenance and operation of its trailer park. Plaintiff appeals.

Plaintiff contends here that the zoning ordinance of the City is unconstitutional and void because it excludes a legitimate use of land from every zoning district; the gain to the public from the zoning restriction is small compared to the hardship imposed upon the individual property owner so that the ordinance is arbitrary, unreasonable and without substantial relation to the public health, safety, morals or general welfare; once the ordinance has been found arbitrary, unconstitutional and void, the landowner need only show that his proposed use is reasonable; and, finally, that equitable estoppel should prevent the City from obtaining relief against plaintiff by virtue of alleged ordinance violations. The City

takes the position that even though the zoning ordinance may be unconstitutional as regards the area in question, that does not render the entire enactment unconstitutional; homeowners had a right to rely on the zoning that existed when they purchased their property and to depend on this zoning not being changed except for the public good; equitable estoppel will not be applied without positive acts by municipal officers which induced the action of the adverse party; and, finally, even though the City did not have a certificate of exemption issued by Cook County, plaintiff must abide by the city ordinances.

Plaintiff is the owner of the entire subject property which is located in the vicinity of 159th Street and Laramie Avenue within the City. For better understanding, a plat of the entire property is presented herewith.

The property consists of two separate parcels. Parcel One, generally located more to the south, consists of Lots 98 to 105 inclusive. As appears from the plat, the southeastern corner of the parcel is excluded. Plaintiff acquired this property by deeds dated September 1, 1965, and December 30, 1967. At that time, and since approximately 1941 or before, this portion of the subject property has been used as a trailer park, except Lot 105 which was adapted to this use shortly after its acquisition.

Parcel Two consists of Lots 97 and 110, which constitute the entire northern portion of the property. The extreme southwestern corner of Lot 110 is not included. As indicated, Lot 110 has a 60-foot frontage on Laramie Avenue, and Lot 97 has a frontage of 120 feet on LeClaire, which is the next street to the east. The total length of these two lots from east to west is 600 feet. Plaintiff acquired Lot 97 by a deed dated May 25, 1967, and purchased Lot 110 during 1968.

The record shows, without objection, that plaintiff paid $140,000 for Lots 98 to 104 inclusive; $9000 for Lot 105 and $15,000 for Lots 97 and 110 combined; a total consideration of $164,000.

It is next necessary to consider the zoning of the subject property. The situation is rather unique, as determination of the existing zoning classification raises contested issues. Plaintiff purchased Parcel One as an operating trailer park. It is undisputed that the City had issued a license to plaintiff to operate the park for 1968, 1969 and 1970. Plaintiff made applications for subsequent years but the licenses were never issued. Plaintiff alleged that the property was partly zoned B-3 for general business uses and partly R-2 for single family uses. The City admitted this in its answer. However, both sides introduced evidence of the actual zoning, and, after hearing all of the pertinent evidence, the trial court found that the entire tract was zoned R-3, a general residence district.

In connection with proof of the zoning, neither party offered a copy of an ordinance certified by the city clerk under the city seal. (Ill. Rev. Stat. 1973, ch. 24, par. 1—2—6). However, a deputy clerk of the City produced a large bound pamphlet, or volume, consisting of 103 pages labeled "Zoning Ordinance Oak Forest Illinois." It bears No. 300 and shows upon the flyleaf that it was adopted by the President and Board of Trustees of the Village of Oak Forest, Cook County, Illinois, September 23, 1964, and that it was prepared by the Oak Forest Planning and Zoning Commission. It is in ordinance form containing the ordaining clause required by statute. (Ill. Rev. Stat. 1973, ch. 24, par. 1—2—2.) There is no map appended to this copy of the ordinance. No subsequent or later zoning ordinance of the City appears in the record.

The pertinent portions of the Municipal Code of the State of Illinois provide that all ordinances of cities which impose any fine or penalty, as does the ordinance in question, shall "be printed or published in book or pamphlet form, published by authority of the corporate authorities \* \* \*." (Ill. Rev. Stat. 1973, ch. 24, par. 1—2—4.) The statute further provides (Ill. Rev. Stat. 1973, ch. 24, par. 1—2—6):

> "Whenever municipal ordinances are printed in book or pamphlet form, and purport to be published by authority of the corpo-

rate authorities, such book or pamphlet shall be prima facie evidence of the contents, passage, and legal publication of such ordinances, as of the dates mentioned in such book or pamphlet, in all courts and administrative tribunals."

■■ Pursuant to this provision of the statute, the only essential to authorize admission in evidence of an ordinance in pamphlet form is the fact that it purports to be published by authority of the president and board of trustees of the municipality as required in the statute. *Illinois Central R.R. Co. v. Warriner,* 229 Ill. 91, 94, 82 N.E. 246.

The statute also provides that a new municipal zoning ordinance may be enacted only after public hearing and submission of a proposed ordinance by a zoning commission appointed by the mayor or president subject to confirmation by the corporate authorities. (Ill. Rev. Stat. 1973, ch. 24, par. 11—13—2.) The deputy clerk testified that she could not locate any ordinance or resolution establishing a zoning commission for the 1964 ordinance. She presented a copy of a legal notice for a zoning hearing before the "Zoning Commission of the Village of Oak Forest" to be held on September 18, 1964, without any certificate of the making of such publication. She testified that the notice was published in a local newspaper on September 3, 1964. In addition, she produced a series of minutes of meetings of the board of trustees which took place when the City was still a village, as well as minutes of the planning commission and of the zoning board of appeals. One set of these minutes recites the holding of public hearings and the making of a report to the board of trustees recommending adoption of the ordinance above described as No. 300. The minutes also show adoption of the ordinance in pamphlet form by a motion which was approved by four trustees, stating their names, with two trustees absent, whose names are stated, and without dissent.

■■ We have concluded that the record amply shows the regular and valid adoption of this ordinance. The ordinance thus produced in pamphlet form is presumptively valid and the burden rested upon plaintiff to overcome that presumption by contrary evidence. (*Bigham v. City of Rock Island,* 120 Ill.App.2d 381, 386, 387, 256 N.E.2d 897.) This was not done. In addition, the record here amply shows proper recordation of the vote of the individual trustees on adoption of the zoning ordinance. *Village of Bourbonnais v. Herbert,* 86 Ill.App.2d 367, 229 N.E.2d 574.

There is a statutory requirement that corporate authorities publish, not later than March 31 of each year, a map which will clearly show existing zoning uses and divisions, restrictions, regulations and classifications for the preceding year. If there are no changes in zoning uses

during any year, no map is required for that year. This map constitutes the official zoning map. (Ill. Rev. Stat. 1973, ch. 24, par. 11—13—19.) No zoning map is appended to the copies of Ordinance No. 300 as above described. However, section V—B—1 thereof describes a zoning district map dated September 23, 1964, which is incorporated and made a part of the ordinance with the same force and effect as if fully set forth therein. There is in evidence a pamphlet copy of Building and Zoning Ordinances of the City, approved in April of 1948 prior to incorporation of the City when it was a village. There is a zoning map appended to this ordinance. It shows the area of the entire subject property to be zoned as a business district as regards the southern portion thereof, and as a residential district as regards the northern portion and more recently acquired Parcel Two. That ordinance, however, was supplanted by the completely new ordinance of September 23, 1964, known as No. 300.

There is in evidence a zoning district map dated 1964 of the entire village. It also has a typewritten statement, "Adopted by the President and Board of Trustees of the Village of Oak Forest, Illinois, this 23rd day of September A. D. 1964" together with the facsimile signature of the president after the word "Approved" and that of the village clerk after the word "Attest" together with a copy of the village seal. This map shows the entire property to be zoned under R-3 or general residence district. What appears to be at least a part of the area here involved also bears the capital letters "T.P." and there is testimony that this has reference to "Trailer Park."

There are two other maps offered in evidence by plaintiff. One is a zoning district map containing the same designations as the map above described as regards official signatures, together with a statement "Revised January 1, 1966." This map shows the subject property to be zoned R-2, or single-family residence, as regards its upper or northern half, and B-3, or general business district, for the southern portion. Another zoning district map has similar designations as regards the facsimile signatures of the mayor and city clerk of the City. It also states thereon "Adopted by the City Board of Trustees." The names of six trustees are printed below this statement. This map shows its date to be "Revision 3/72." The subject property is shown to be zoned B-3, general business district, for the southern portion, and R-1, single-family-residence district, for the northern portion. The map purports to be issued in March of 1972, which is the month designated for issuance of zoning maps by the statute above quoted.

■■ The pertinent statute and decided cases require that all amendments and changes of zoning districts must be made "from time to time

by ordinance after the ordinance establishing them has gone into effect, but no such amendments shall be made without a hearing before some commission or committee designated by the corporate authorities." (Ill. Rev. Stat. 1973, ch. 24, par. 11—13—14.) The same statute provides for notice by publication in a newspaper published in the community prior to such hearings. It has been held that the amendment is a mandatory requirement and that even a resolution by a city council "cannot substitute for the passage of a formal ordinance which is required by the zoning statute." *Western Pride Builders, Inc. v. Koraska,* 91 Ill.App.2d 458, 462, 235 N.E.2d 313.

■■ The city clerk could not produce any ordinance purporting to show amendments to the zoning districts of defendant City at any time after September 23, 1964. Also, the clerk was unable to produce any ordinance, resolution or other evidence of approval by the City authorities of the two subsequent maps dated January 1, 1966 and March 1972. Thus, all maps, after the one dated September 23, 1964, appear to lack official authority for their publication. In addition, it does not appear that any proper amendatory zoning action was taken by the City with reference to the subject property at any time after the adoption of Ordinance No. 300 and the publication of the first map dated September 23, 1964. The city clerk could not produce any evidence of a public hearing regarding change of zoning of the subject property at any time after September 23, 1964. It has been held that the publication of a zoning map "does not constitute the passage of an ordinance giving validation, as variations, to such differences as may exist between the classifications appearing on the map and those existing under the local municipal zoning ordinances." See *Western Pride Builders, Inc. v. Koraska,* 91 Ill. App.2d 458, 463.

A number of experts called by plaintiff and by defendant testified that the portion of the property last acquired by plaintiff, above described as Parcel Two, is zoned R-2 and the balance is zoned B-3. In our opinion, the evidence shows, as the trial court specifically found, that the property in the proposed addition to the subject property (Parcel Two) is zoned R-3, as a general residence district which includes multiple apartments within the list of proper uses.

Parcel One of the subject property, the southern portion thereof, is now used exclusively as a trailer court. Parcel Two, the northern portion, consisting of Lots 97 and 110, is now vacant. Immediately abutting to the north of the northern boundary of the subject property there is a series of lots which front upon 158th Street. According to the official zoning map dated September 23, 1964, these lots are zoned R-2 for single-family residence use. There are about eight homes built upon

certain of these lots. Virtually all of them have rear yards and face to the north upon 158th Street.

LeClaire Street constitutes the eastern boundary of the subject property with the exception of the small piece on the southeast corner which is not included. Parcel Two, being vacant, has a frontage of 120 feet on LeClaire. On the east side of LeClaire, progressing in a southerly direction from 158th Street, there is an area of single-family residences, then a parking lot and then an apartment complex of 124 units. The northeast corner of 159th Street and LeClaire is occupied by a gasoline station.

The southern boundary of virtually all of the subject property, except for the omitted portion at the extreme southeast tip, is formed by 159th Street, a four-lane highway designated as State Route No. 6. On the southeast corner of LeClaire and 159th Street is another apartment complex consisting of five buildings containing 160 units.

Progressing now to the block comprising the south side of 159th Street, between LeClaire and Laramie, there is a series of business uses such as a real estate office, jewelry store, a fine-arts store, a bar and an automobile repair shop. It should be noted that, although the official map of September 23, 1964, shows 159th Street in the area of the subject property as being included within an R-3 zone, there is evidence that on both sides of this street the uses are predominantly business and commercial. The depth of these uses on both sides is not constant but varies. One parcel, 1300 feet deep, is used as an automobile dealership at a location about one-half mile west of the subject property. There is a small shopping center built on the southwest corner of 159th Street and Laramie.

Laramie Street is an improved highway with four traffic lanes. On the northeast corner of 159th Street and Laramie, which is not included within the subject property, there is a restaurant in the process of construction. North of the restaurant, and south of Lot 110, there are three single-family homes fronting on Laramie. The value of each of these homes has been estimated from $18,000 to $22,500.

As would be expected, the testimony of expert witnesses differed as to the highest and best use of the subject property. John H. Pittroff, Jr., a qualified real estate appraiser, was called by plaintiff as an adverse witness and also testified for the City. In his opinion, the highest and best use of the entire subject property was for a mobile-home park. However, he conditioned this opinion upon the requirement that there should be a reasonably low density of use. He cited the mobile homes and mobile-home-park ordinance of Cook County to the effect that each site in a mobile-home park had a minimum-size requirement of

2500 square feet, with 1000 square feet for parks existing prior to August 21, 1967. (Cook County Ordinance of June 5, 1972, sec. 9.3.) After visiting the plaintiff's park, he expressed the opinion that the density of mobile homes there should not exceed 10 units per acre. This would be equivalent to about 4350 square feet per site. In his opinion, if the condition of low density combined with a proper site plan were met, no detriment would result as regards the value of the single-family homes located in the surrounding area.

In his testimony as a witness for the City, the expert testified that in his opinion a proposed site plan tendered by plaintiff for the entire subject property would provide for 68 to 70 sites as regards the entire subject property and that this density was 75% higher than it should be. Assuming that Parcel Two were zoned for multiple-family use and that 20 apartment units could be built thereon, in his opinion it would have a value of $30,000. If it were zoned for mobile homes, assuming 15 units were allowed, it would have a value of $30,200. In his opinion the entire subject property had a land value of $80,000.

Another qualified real estate appraiser called by plaintiff, Joseph A. Nowicki, expressed the opinion that the highest and best use of Parcel Two was for an extension of the mobile home park presently existing on Parcel One. As reasons for his opinion, he considered the existence of the trailer park on the southern portion of the subject property; the fact that 159th Street is predominantly a business street with commercial enterprises to a varying depth on both sides of the street; and, finally, expansion of the use of the trailer park to the north would permit a better design, a better traffic pattern and would relieve congestion in the entire park.

In his opinion, this expansion of the trailer park would not have any adverse effect on the adjoining single-family homes. He also expressed the opinion that Parcel Two was not feasible for use for single-family development. This opinion was predicated upon the assumption that the present zoning is R-2. His reason was that the City ordinance requires 60 feet of frontage for each single-family home. This would permit one home to be built fronting on Laramie Street and two on LeClaire and would leave the remaining nine-tenths of an acre land-locked. In addition, he expressed the opinion that this area could not be used for apartment development because the City ordinance requires 75 feet of frontage for this use.

As regards value of the property, in his opinion Parcel Two, zoned partly for apartments and partly for residential use, would have a value of about $67,000. If the land were zoned for mobile homes, its

value would be $94,500, but the method of capitalizing anticipated earnings from the sites would give a value of over $100,000.

Plaintiff also called Paul Meves, a qualified consulting civil engineer. He pointed out technical difficulties that would arise in use of Parcel Two for single-family or for apartment use. These problems are caused in part by the irregular shape of Lot 110, comprising the western portion of the property, and in part by the absence of a street across the northern edge of the parcel. Installation of such a street with the required width of 60 feet would seriously impair the utility of the property.

The last expert called by plaintiff was Robert Grossman, a qualified city planner. He expressed the opinion that the highest and best use of Parcel Two was an extension of the existing trailer park to the north. In his opinion, this property was not feasible for use as an apartment development for townhouses because of lack of access and proper space for adequate parking.

This witness also testified to the feasibility of a proper layout and design of the entire trailer park including the expanded area. Plaintiff introduced in evidence a plat of survey indicating the location of each of the proposed sites for mobile homes upon the entire subject property. The expert witness testified that, using this sketch as a basis, he had prepared an overlay for proposed use of the entire subject property as a mobile-home park. The expert pointed out that at present Parcel One is operated as a trailer park and includes 52 units on 2.772 acres of ground; an average density of 18 units per acre. The sketch overlay plan presented by him, and received in evidence, indicates expansion of the use to Parcel Two which would include 14 additional mobile-home units on a total of 1.446 acres; a density of 10 units per acre for the newer portions of the park comprising Parcel Two. Defendant's witness (Pittroff) had testified that this density would be acceptable and, in fact, would constitute the highest and best use of Parcel Two and would not have a detrimental effect on the single-family homes to the north. It should be noted that, considering the entire subject property, the density of the entire use would be a total of 66 units on 4.218 acres, which would average out to 16 units per acre.

The proposed sketch shows an access roadway 24 feet wide running in an east and west direction between LeClaire and Laramie. The planner also envisioned a solid fence on the north boundary of this roadway which would be a separation or buffer between the trailer park and the backyards of the homes fronting on 158th Street. The plat also shows access roads of similar size across the southern boundary of the property fronting on 159th Street and also through the entire property

to provide ease of access. There would also be provision for an open area or patio, some guest parking and a trash collection station, all of which are lacking in the present trailer park.

The planner testified that he had considered the residential homes in the area in arriving at his opinion of highest and best use. He characterized the proposed driveway on the north as providing a "firm separation" between the trailer park and the single-family homes. Thus, in his opinion, expansion of the trailer park in accordance with his sketch would have no economic effect on existing homes.

The City called William McCann, a qualified broker and appraiser. In his opinion, the highest and best use of Parcel Two was an R-2 or single-family use as regards the frontage of 60 feet on Laramie Avenue. He stated that the entire remaining area of the parcel should be used for low-rise multiple-family dwellings. He detailed the various factors which entered into his opinion, such as the size and shape of the property; the presence of single-family residences immediately to the north; the existence of the trailer park on Parcel One; the large apartment construction on the east side of LeClaire; the widening and trend of 159th Street and of Laramie; proximity of schools, shops and transportation; need for multiple dwellings in the area; tax benefits to the City and the plan submitted by plaintiff. In his opinion, the ideal density for mobile homes is from seven to nine units upon each acre.

Upon examination of the mobile-home park, he expressed the opinion that it was established prior to 1941. The homes to the north of Parcel Two were built after the establishment of the park. Therefore, the depreciatory effect had occurred prior to the building of the homes, but expansion of the park would augment the depreciation. He had knowledge of the restaurant in the process of construction on the northeast corner of Laramie and 159th Street and the fact that single-family homes along the western portion of the subject property would abut this construction. However, he felt that this would not depreciate these homes, because the zoning of the restaurant area was in effect before the construction. In this regard, he considered that the homes facing on the south side of 158th Street were built immediately next to land zoned for single-family uses. He testified on the supposition that Parcel One was zoned B-3 and Parcel Two zoned R-3 in accordance with the latest zoning map which the trial court and this court have rejected.

This witness expressed no opinion as to the value of Parcel Two under different types of zoning or uses. In addition, he did not present any economic study or opinion upon the feasibility of devoting Parcel Two to residential uses.

The City also called Alan P. Trayser, a qualified planning consultant.

He expressed the opinion that the highest and best use of Parcel Two was, as stated by the previous witness, for a single-family residence fronting upon Laramie Street with the balance of the tract to be used for an apartment building. This witness made no economic analysis as to the return that an owner could reasonably expect if Parcel Two were to be devoted to the use he suggested. Also, not being an appraiser, he gave no opinion as to the comparative value of Parcel Two if devoted to different uses.

This witness also presented an alternate suggestion. He would approve the relocation of the mobile homes presently situated on Parcel One by spreading them out so as to utilize all of Parcel Two except the western 60 feet thereof fronting on Laramie Street, which could be used for a single-family home. He was not familiar with the cost of relocating all of the trailers and did not know where storm sewers, water lines or sanitary sewers were located with reference to Parcel Two. His opinion was based upon the same assumption as used by the previous witness that an apartment building could be erected on Parcel Two which would comprise 20 apartments units. However, he conceded that under City ordinances 20 units would not be permitted. In addition, there would be difficulty of access from LeClaire to a proposed apartment building. This could only be accomplished by creating an access road with a turnaround which would require backing up by every automobile which sought to enter and leave.

A statement of additional evidence is pertinent at this point. The building commission of the City testified that the plot plan suggested by plaintiff utilizing the entire subject property would reduce the congestion in the center of the park, as each proposed site upon Parcel Two would be approximately 2500 square feet in area. Also, in his opinion, demolition and removal of several cottages now present upon Parcel One would improve the park as regards health, safety and welfare and would increase the distance between trailers. The mayor of the City also testified that development of the entire site in accordance with plaintiff's suggested plan would reduce the danger to health and public safety by reducing the density. He agreed that demolition of the cottages would be an improvement and testified that he had a report that application for demolition had been made. The statement is made in plaintiff's briefs, and not contradicted, that such demolition has been accomplished.

In addition, both of the experts called by the City testified that a reduction of density of units upon the trailer park, relieved by the use of Parcel Two for the purpose of dispersing existing units, would tend to depreciate surrounding property values. It should be pointed out that

these experts apparently based their opinions upon an assumption of a density of approximately 10 mobile units per acre. This is the density which is called for in the plan submitted by plaintiff as regards Parcel Two, which is the closest area to single-family homes in the vicinity.

■■ All of the experts called by both sides agreed that there is a short-age of low-cost housing of the type provided by mobile-home parks. This type of housing is unique in that it provides comfortable dwelling at low cost. There is no other mobile-home park located within the City, and the closest establishment of this type is near the city of Frankfort, some 3 or 4 miles away. The courts of Illinois should take judicial notice of this situation which has been stated as a legislative finding in the new Illinois Mobile Home Parks Statute effective September 8, 1971. (Ill. Rev. Stat. 1973, ch. 111½, par. 711.) The legislature noted the serious housing shortage in Illinois; difficulty of new construction for moderate- and low-income citizens because of rising construction costs; depletion of existing housing by demolition and advances in the construction of mobile homes so that proper regulation and licensing thereof could contribute to quality housing for the citizens of Illinois.

■■ The City called two persons who own homes immediately to the north of the subject property. One of them expressed the opinion that he was opposed to expansion of the trailer park because it would reduce the value of his home. The other witness testified that she had placed her home upon the market for sale. As regards this testimony, the courts of Illinois have commented "that the use of property cannot be restricted or limited merely because neighboring property owners so desire, or because they think it might protect the value of their residences." *Regner v. County of McHenry*, 9 Ill.2d 577, 582, 138 N.E.2d 545, cited in *Stalzer v. Village of Matteson*, 14 Ill.App.3d 891, 899, 303 N.E.2d 489.

One of these witnesses testified that he had purchased his home in January of 1964 for $19,200. An expert witness approximated the value of each of the eight homes in this particular area as being from $27,500 to $37,000. The other witness purchased her home for $21,500 and listed it for sale for $27,500. It is, therefore, well observed that, even considering the effects of inflation, general statements by lay witnesses regarding fear of reduction of their property value have small significance.

We will first consider the zoning of Parcel Two, the northern portion of the subject property, and the validity of the municipal ordinance as regards the use proposed by plaintiff.

As above pointed out, the ordinance applicable here is No. 300, adopted as of September 23, 1964. This ordinance is a comprehensive

zoning ordinance for the entire City. It defines a mobile home as "A trailer designed and constructed for dwelling purposes." (Ordinance No. 300, section XV, page 100.) It defines a trailer as "Any vehicle or portable structure constructed so as to permit occupancy thereof for lodging or dwelling purposes or for the use as an accessory building or structure in the conduct of a business, trade, or occupation, and which may be used as a conveyance on streets and highways, by its own or other motive power." Ordinance No. 300, section XV, page 105.

The ordinance contains three classifications for residence districts, three for business districts and one manufacturing district. The ordinance makes no provision for establishment of a trailer or mobile home park in any of these districts. It has no provision for establishment of a trailer park within the City as a special use. In fact, the ordinance goes further and expressly prohibits such residential use of mobile homes (Ordinance No. 300, section IV, subdivision J):

"J  TRAILERS, MOBILE HOMES, AND BOATS

1  Trailers shall not be permanently affixed to the ground as principal or accessory buildings on a lot in any district.

2  Trailers shall not be parked or stored in the open on any lot, except when herein permitted in the operations of a lawfully established trailer sales or manufacturing establishment.

3  Temporary parking and use of trailers shall be permitted when a permit has been issued by the Building Inspector for the following purposes:

a  Parking in the open and use of mobile home or travel trailer for lodging purposes on a lot containing a dwelling, provided it is not parked or used thereon more than two days in any consecutive 30 day period.

b  Parking and use of trailers for temporary office or storage uses incidental to and only for the period of time of construction of a building development, provided such trailers are located on the same or contiguous lots as the building development.

4  One boat owned by the occupant of the dwelling may be stored or parked in the rear yard of a lot containing a single-family detached dwelling, provided no major repair, disassembly, or rebuilding operations are conducted."

■■  A similar situation was brought before this court (Second District) in *High Meadows Park, Inc. v. City of Aurora*, 112 Ill.App.2d 220, 250 N.E.2d 517, *leave to appeal denied*, 42 Ill.2d 583. There, the Aurora ordi-

nance prohibited trailer parks within the entire limits of that city. The court held this prohibitory ordinance to be void. The court pointed out that the business of operating a mobile-home park is legitimate as recognized by the statutes of Illinois. Municipalities have power to regulate use and construction of house trailers, but they do not have power entirely to prohibit this lawful business. (112 Ill.App.2d 220, 228.) In addition, after the decision in *High Meadows*, the supreme court held that an ordinance making unlawful the maintenance of a trailer for residential use on any plot of ground within the City, except in a licensed trailer-coach park, was void because it was beyond the necessary or implied authority of the municipality. *City of Sparta v. Brenning*, 45 Ill.2d 359, 259 N.E.2d 30.

As the court pointed out in *City of Sparta*, the City there had not attempted to exercise its admitted statutory authority to enact a comprehensive zoning ordinance. This situation must be carefully differentiated from cases such as *Village of Cahokia v. Wright*, 57 Ill.2d 166, 311 N.E.2d 153. There, the village had enacted a comprehensive zoning ordinance which permitted establishment of trailer parks under certain specified zoning classifications. (See 57 Ill.2d 166, 169.) In such an instance, the court held that a zoning amendment which prohibited parking or occupation of trailers in any district outside of an approved trailer park was within the limits of proper and legal regulation by the municipality. The distinction here rests upon the difference between regulation and prohibition. In *City of Sparta*, the court dealt with a prohibition of the use of trailers not coupled with a legitimate regulation thereof. The same situation existed in *High Meadows* and in the case before us. In these three cases, the trailer park is effectively prohibited anywhere within the municipal limits either by complete absence of any comprehensive zoning ordinance, as in *City of Sparta*, or by elimination from the zoning ordinance of any provision whatsoever for any use of trailer parks, as in *High Meadows*, and in the case at bar. *Village of Cahokia*, on the contrary, represents a situation where the prohibition of trailer parks within certain established zoning areas amounts merely to regulation thereof, since other portions of the comprehensive ordinance permit this legitimate use.

Therefore, insofar as Ordinance No. 300 of the City purports to prohibit the establishment of a trailer park anywhere within the City, without exception, it is beyond the power of the municipality and void. However, as the City urges here, it does not follow from this that plaintiff may establish a trailer park in any portion of the City. This contention was carefully considered in *High Meadows* and rejected. The court there

pointed out the rationale for development of the special use technique and also concluded that the ordinance before it (112 Ill.App.2d 220, 230, 231):

> "* * * should be categorized as an exclusionary zoning ordinance which does not prohibit mobile home parks by its terms, but fails to make any provision for that use. In our opinion this failure does not render the zoning ordinance unconstitutional and void in its entirety. And it may or may not be unconstitutional and void as applied to the specific property in question."

In other words, the court concluded that the validity of a proposed legitimate use for which a comprehensive zoning ordinance has failed to provide must be "tested by the traditional considerations applied to zoning ordinances to determine whether they are an unreasonable or arbitrary exercise of the police power." 112 Ill.App.2d 220, 229.

■■ The court arrived at this conclusion upon the authority of *Builders Supply & Lumber Co. v. City of Northlake,* 21 Ill.2d 14, 170 N.E.2d 597, where the supreme court used the same approach in considering the validity of an ordinance of the City of Northlake which did not prohibit multiple dwellings but simply failed to provide for such use. In *Builders Supply,* the supreme court applied the various factors affecting the validity of a zoning classification as set forth in *Galt v. County of Cook,* 405 Ill. 396, 404, 91 N.E.2d 395. These pertinent considerations need not be repeated here as they have been stated and repeated so many times by our supreme and appellate courts. For example, these factors are set forth in *La Salle National Bank v. City of Evanston,* 57 Ill.2d 415, 428, 429, 312 N.E.2d 625. It should also be noted that the City ordinance before us contains a separability clause so that the invalidity of the prohibitive sections would not affect any other provisions of the total enactment. Ordinance No. 300, section III, paragraph B.

Before analyzing the evidence in the light of the criteria set forth in *La Salle National Bank* and in so many other cases, we must consider whether the traditional presumption in favor of municipal ordinances is operative. This is set forth in scores of cases including *La Salle National Bank* where the principle is pointed out that one who seeks to assert the invalidity of a zoning ordinance must prove his case by clear and convincing evidence. (See 57 Ill.2d 415, 428.) In the usual zoning case we are concerned with an affirmative enactment by a municipality restricting the right of a landowner to devote his property to certain use. The reasoning and necessity for applying the presumption of validity seem clear in these cases. In the case before us, we have no enactment of any kind bearing upon the desired use, which is admittedly legitimate.

Shall we apply a presumption of validity to the absence of an enactment?

As shown, this comprehensive ordinance makes no specific provision for establishment of a trailer park and has no provision for such special use, so that the ordinance is completely silent on the problem. It would not seem logical to apply a presumption of validity to such inaction by the municipal authorities. We find no specific authority on this point. We will abstain from deciding it because, under the view which we take of the evidence, plaintiff is entitled to devote its property to the use it desires regardless of whether or not the presumption of validity exists. It remains to analyze the evidence under applicable criteria. In applying these standards, it must be remembered that each zoning case "must necessarily be decided on its own particular facts * * *." *Marquette National Bank v. County of Cook*, 24 Ill.2d 497, 501, 182 N.E.2d 147.

One-half of the southern border of Parcel Two abuts directly upon Parcel One which has been used as a trailer court for many years. The eastern boundary of Parcel One abuts upon LeClaire Avenue, a four-lane highway, which has uses such as apartment buildings, a gasoline station and the established trailer court forming Parcel One. Part of the western border of Parcel Two abuts on Laramie Avenue, which is a heavily traveled four-lane highway. There are single-family homes immediately south of the western edge of the parcel and a number of such homes with their backyards facing its northern edge.

As regards property value, one of plaintiff's experts testified that, if Parcel Two could be used for apartment and residential use, it would be valued at $67,000. If zoned for mobile homes, its value would be either $94,500 or $100,000 depending upon the method of valuation. An expert called by the City testified that the value of Parcel Two, if improved with an apartment building of 20 units, would be $30,000. If used for mobile homes, assuming 15 units, it would be valued at $30,200. However, the record shows that the site was not feasible for construction of a 20-unit apartment building and that this would be prevented by City ordinances.

■■ The loss of value to plaintiff is not conclusive in and of itself. The important factor here is that this loss to plaintiff will not result in any enhancement of the public welfare. *La Salle National Bank v. County of Cook*, 12 Ill.2d 40, 47, 48, 145 N.E.2d 65.

On the contrary, the general welfare of the residents of this City would best be served by permitting an expansion of the trailer park, under proper salutary regulation, to provide comfortable dwellings at low cost. This point of view is supported by the policy of the State of Illinois as above pointed out (Ill. Rev. Stat. 1973, ch. 111½, par. 711)

as well as by the opinion of each and all of the experts called by both sides. They agreed unanimously upon the existence of a shortage of low-cost housing of the type provided by mobile-home parks.

██ It does not appear that the use of Parcel Two requested by plaintiff will be harmful in any manner to the health, safety, morals or general welfare of the public. The only additional restriction needed here would be the imposition of a condition upon the proposed use that all of the provisions of applicable regulatory legislation be applied to the use, which we will hereinafter consider. The evidence convinces us that proper use of Parcel Two as a trailer court by plaintiff will not have a deleterious effect upon single-family homes in the vicinity. Two experts called by plaintiff expressed the opinion that the single-family homes in the area would not be adversely affected by expansion of the trailer park use. Their opinion also was conditioned in part upon proper regulation of this use.

One of the experts called by defendant testified that expansion of the trailer park would augment depreciation of these homes. Yet he expressed the opinion that the two small homes immediately to the southwest of Parcel Two would not be affected by the installation of a restaurant immediately next to them. In addition, he agreed that decrease in density of the trailer use upon Parcel Two would tend to appreciate surrounding property values. As we will later consider, the use desired by plaintiff for Parcel Two envisions a density of 10 mobile units per acre. The planning expert, who had worked out this layout and design for plaintiff, testified that such expansion of the use would not have any economic effect upon the existing homes. In any event, despite the displeasure expressed by two residents in the area, the zoning power of a municipality "cannot be exercised to satisfy the individual desires of a few." *Cosmopolitan National Bank v. Chicago*, 27 Ill.2d 578, 585, 190 N.E.2d 352.

██ As regards the suitability of the subject property for the purposes for which it is presently zoned, namely, for construction of apartment buildings under an R-3 use, the evidence clearly supports plaintiff's position. The first expert called by plaintiff testified under the mistaken but understandable assumption that Parcel Two is presently zoned under the R-2 classification for single-family residences. He was of the opinion that only one single-family home could be built fronting on Laramie Street and two on LeClaire, which would leave nine-tenths of an acre landlocked and useless. A qualified civil engineer called by plaintiff testified to the difficulties that would be encountered in connection with access to the property in the event of contemplated use for an apartment building. One of the experts called by the City conceded that

Parcel Two could not be devoted to apartment use with a building of 20 units under existing City ordinances. The City made no attempt at economic analysis of this type of apartment project on Parcel Two.

With this in mind, it can be readily comprehended why Parcel Two is presently vacant and why plaintiff purchased it for the expansion of an existing use. The principal factors here are the irregular shape of the parcel, the existence of the trailer park to the south and the lack of possible street access. The evidence does not show how long Parcel Two has remained vacant but it shows convincingly that other tracts of land in the area with ample frontage on LeClaire and on Laramie and with consequent ready vehicle access have actually been developed to apartment uses. Similarly, both sides of 159th Street for long distances in both directions of the subject property appear to have been well developed for business uses.

As regards the highest and best use of the property, we find that plaintiff's experts, a real estate appraiser and a planner, expressed the opinion that the highest and best use of Parcel Two was for a proper extension of the existing trailer park. The appraiser called by the City expressed the opinion that the property should be used for single-family and multiple dwellings. The qualified planning consultant called by the City also stated that this would be the highest and best use; but, he also approved in theory the alternative suggestion of relocating the trailers presently contained on Parcel One by utilizing all of Parcel Two so as to achieve a lower density.

In analyzing the expert testimony, we must consider that "[t]he fact that there may be a difference of opinion among expert witnesses does not require a finding that the reasonableness of the ordinance is debatable." (*Myers v. City of Elmhurst*, 12 Ill.2d 537, 544, 147 N.E.2d 300.) Indeed, it would be a most rare and remarkable zoning case in which all of the experts agreed on all points. In the case before us, however, there is strong opinion by plaintiff's experts, acceded to alternatively or with some qualification by the City's experts, pointing to the conclusion that the use so long established on Parcel One should be expanded on to the land comprising Parcel Two.

One of the basic factors involved in validity of a zoning ordinance is whether the subject property is zoned in conformity with existing uses in the immediate area. (*Bennett v. City of Chicago*, 24 Ill.2d 270, 181 N.E.2d 96.) In the case before us, Parcel Two must necessarily be affected and its character determined by the long-established use of the mobile-home park immediately to the south thereof. An obvious and potent factor here is that the problem of access to Parcel Two can only be solved in any practical manner by the use of Parcel One which abuts

upon 159th Street. In other words, the only free vehicular access to Parcel Two is through Parcel One. *Kuiken v. County of Cook,* 23 Ill.2d 388, 178 N.E.2d 338, is strikingly similar to the case before us. There also, the issue was the propriety of a county zoning ordinance classifying as R-2 a parcel of land immediately adjacent to and contiguous with an established trailer park. The court held that the public welfare would not be served by the restriction and the ordinance was accordingly invalidated. In our opinion, this conclusion of invalidity is manifest from the evidence in the instant case whether or not we apply the presumption of validity in a negative manner to the failure of the municipality to act.

We, therefore, conclude that the judgment order appealed from should be reversed insofar as it restricts plaintiff from use of Parcel Two for a trailer park in conjunction with the balance of the subject property. However, in our opinion, a proper judgment should be entered permitting this use subject to proper regulation of the development of the site as will be hereinafter set forth in connection with our discussion of the issues arising under the counterclaim of the City.

■■ The judgment order appealed from found that the mobile-home park presently operated by plaintiff on Parcel One violates the existing ordinances of the City in five respects: maintaining trailers on lots less than 1200 square feet; maintaining cabins and trailers with less than a 15-foot separation; maintaining trailers beyond the established setback lines; permitting trailers to be used as apartments and maintaining the park without a City license. The evidence amply supports the judgment order which enjoined plaintiff from operating the mobile-home park until these specified violations were corrected.

There are a number of legislative enactments pertinent here. The State of Illinois regulation appears in "An Act to provide for * * * mobile home parks * * *" (Ill. Rev. Stat. 1973, ch. 111½, par. 711 *et seq.*). No State license will be issued to operate a mobile-home park without compliance with existing municipal zoning ordinances. In counties with a population of one million or more, each mobile home shall have a site not less than 1000 square feet. No home is to be parked closer than 5 feet to the side lot lines. There shall be an open space of at least 10 feet adjacent to the side of each home and 5 feet adjacent to each end. The statute also provides that in addition to the State license, any county or municipality may provide for the licensing of a mobile-home park within its corporate limits, but this shall not exempt the park from the State licensing provisions. (See par. 728.) This last mentioned paragraph of the statute was enacted effective September 8, 1971. However, even prior to this enactment, it had been held that

the statute, as it then existed, "was not enacted to supplant municipal regulation, but rather to fill the breach where no municipal regulation applies. Where there is local regulation, the statute requires compliance with whichever standards, State or municipal, are higher * * *." (*Rezler v. Village of Riverside*, 28 Ill.2d 142, 147, 190 N.E.2d 706.) Thus existing State law does not preclude the operation of municipal regulation.

■■ On September 16, 1949, the City (then a village) enacted an ordinance licensing and regulating tourist cabins and trailer camps. This ordinance is more stringent than State requirements. It provides for a minimum site area of 1200 square feet; at least 15 feet of separation in all directions between trailers; compliance with all zoning laws concerning setbacks and lot lines; and for the issuance of City licenses. The trial court applied this ordinance in entering the order enjoining plaintiff from specified violations. This ordinance is, in our opinion, applicable to the operation of plaintiff's trailer camp. Plaintiff itself obtained a number of licenses ostensibly as authorized by this ordinance. The language of the State legislation expressly justifies and permits operation of the City ordinance. The subsequent comprehensive zoning ordinance of the City attempted a repeal of the trailer-park-license ordinance, not expressly but by necessary implication. However, since this attempted repealer is void, as above shown, it follows that the original ordinance remains in full force and effect.

Plaintiff urges that the existing ordinance of Cook County, which licenses and regulates mobile homes and mobile-home parks enacted June 5, 1972, is applicable here. In fact, plaintiff proved by expert testimony that the site plan proposed by it complies in all respects with the county ordinance. This ordinance also points out the serious need for low-cost housing such as provided by mobile homes in Cook County. It provides that each site shall have a minimum of 2500 square feet, with sites existing prior to August 21, 1967 to have not less than 1000 square feet. Any mobile home is to be parked not closer than 5 feet to side lot lines and there must be an open space of 10 feet adjacent to the side and 5 feet to the ends of every mobile home. The ordinance provides (section 20) that it is not applicable to mobile-home parks located wholly within any city or village which has adopted an ordinance substantially as stringent, or more stringent, than the county ordinance and which has notified the County Health Department in writing that it desires solely to regulate mobile-home parks within its corporate limits.

■■ The Illinois Constitution of 1970 designates Cook County as a home-rule unit and provides (Ill. Const. (1970), art. VII, sec. 6(c)):

"If a home rule county ordinance conflicts with an ordinance of a municipality, the municipal ordinance shall prevail within its jurisdiction."

In addition, the statute granting counties authority over the maintenance of "camps or parks accommodating persons in house trailers * * *" expressly limits the authority of the county to situations "where such buildings, structures and camps or parks are located outside the limits of cities, villages and incorporated towns * * *." (Ill. Rev. Stat. 1973, ch. 34, par. 422.) In view of these enactments, we hold that the ordinance of the City is applicable to the operation of plaintiff's existing trailer camp on Parcel One.

■■ The final contention raised by plaintiff is an attempt to invoke the doctrine of estoppel against the City. Plaintiff cites cases involving issuance of a building permit by a municipality and subsequent delay by the city followed by a belated attempt to halt further construction in accordance with permit. (*Cities Service Oil Co. v. City of Des Plaines*, 21 Ill.2d 157, 171 N.E.2d 605; *City of Chicago v. Grendys Building Corp.*, 4 Ill.App.3d 634, 281 N.E.2d 708.) No such situation exists here. The City issued licenses to plaintiff for 3 years for operation of the trailer court upon Parcel One. For subsequent years, until the present time, the City has accepted license applications from plaintiff but no license has been issued. In this situation, we cannot find any substantial change of position by plaintiff such as the making of extensive expenditures by it. This is a necessary element in connection with the creation of an estoppel. (See 4 Ill.App.3d 634, 639.) The City is not estopped from enforcing the salutary provisions of its applicable ordinances by the previous issuance of a license.

The judgment order appealed from is affirmed insofar as it enjoins improper operation of the trailer camp by plaintiff on Parcel One in violation of the applicable City ordinance. Insofar as the judgment order denies plaintiff's right to expand the mobile-home park use to Parcel Two of the subject property in accordance with the plan proposed by plaintiff, the order is reversed. The cause is remanded for further proceedings not inconsistent with this opinion.

Judgment partially affirmed and partially reversed and remanded with directions.

BURKE, P. J., and LORENZ, J., concur.